# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**CHRISTINE L. ZOOK**
Ferguson & Ferguson
Bloomington, Indiana

ATTORNEYS FOR APPELLEE
GENERAL FIRE AND CASUALTY
COMPANY:

**JAMES A. GOODIN**
**ELIZABETH J. WYSONG BERG**
Goodin Abernathy, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
INDIANA INSURANCE COMPANY and
PEERLESS INSURANCE COMPANY:

**RICK D. MEILS**
**WILLIAM M. BERISH**
**JOHN W. MERVILDE**
Meils Thompson Dietz & Berish
Indianapolis, Indiana

FILED
Oct 29 2014, 10:07 am
CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

TOM SEEBER,                                )
                                           )
    Appellant-Plaintiff,               )
                                           )
      vs.                           )    No. 53A01-1405-PL-208
                                           )
GENERAL FIRE AND CASUALTY                  )
COMPANY, INDIANA INSURANCE                 )
COMPANY, and PEERLESS INDEMNITY            )
INSURANCE COMPANY,                         )
                                           )
    Appellees-Defendants.              )

APPEAL FROM THE MONROE CIRCUIT COURT
The Honorable E. Michael Hoff, Judge
Cause No. 53C01-1011-PL-2790

**OPINION - FOR PUBLICATION**

**BRADFORD, Judge**

**CASE SUMMARY**

In the fall of 2008, Appellant-Plaintiff Tom Seeber owned a commercial building located on North College Avenue in Bloomington (the "Building"). The Building was leased to Harry and Karen Kidwell, who operated Delilah's Pet Shop. On November 3, 2008, the Building was destroyed by fire and determined to be a total loss. At the time of the fire, Seeber had an insurance policy for the Building that was issued by Appellee-Defendant General Fire and Casualty Company ("General Fire & Casualty"). The Kidwells had an insurance policy relating to their interests in the Building that was issued by Appellees-Defendants Indiana Insurance Company and Peerless Indemnity Insurance Company (collectively, "Indiana Insurance"). As a result of the fire, General Fire & Casualty and Indiana Insurance (collectively, "the Insurance Companies") agreed that the actual cash value of the Building was $512,418.12 and the replacement cost was $650,812.70. The Insurance Companies thereafter collectively paid Seeber the full $512,418.12 actual cash value of the building.

Seeber subsequently claimed that he was entitled to receive the full $650,812.70 replacement cost of the building. Seeber filed a complaint for declaratory judgment on November 1, 2010, asking the trial court to interpret his rights under the relevant insurance policies. On December 30, 2013, Seeber filed a motion for summary judgment, along with

designated evidence and a memorandum in support of his motion. Also on December 30, 2013, General Fire & Casualty and Indiana Insurance each filed motions for summary judgment, designated evidence, and supporting memoranda. The trial court conducted a hearing on all outstanding motions on March 21, 2014. On April 17, 2014, the trial court entered an order denying Seeber's motion for summary judgment and granting summary judgment in favor of the Insurance Companies.

On appeal, Seeber contends that the trial court erred in denying his request for summary judgment and in granting summary judgment in favor of the Insurance Companies. Seeber specifically claims that the Insurance Companies were not entitled to an award of summary judgment because, under the applicable policy language, he was entitled to recover $650,812.70, the replacement cost of the building that was destroyed by fire. Concluding that the trial court properly denied Seeber's request for summary judgment and granted summary judgment in favor of the Insurance Companies, we affirm.

## FACTS AND PROCEDURAL HISTORY

### A. Facts Relating to the Building Destroyed by Fire

In the fall of 2008, Seeber owned the Building.[1] The Building was leased to Harry and Karen Kidwell, who operated Delilah's Pet Shop. On November 3, 2008, the Building was destroyed by fire and was determined to be a total loss.

At the time of the fire, Seeber had an insurance policy for the Building that was issued by General Fire & Casualty. The Kidwells had an insurance policy relating to their interests

---

[1] Seeber owned the Building with his brother, John Seeber. John subsequently signed his interest in the Building over to Seeber.

3

in the Building that was issued by Indiana Insurance. At some point, the Kidwells and Seeber entered into a "settlement agreement and mutual release" that stated, in part: "The Kidwells hereby assign to [Seeber] any and all right, title and interest the Kidwells *may* have to receive additional proceeds under the [Indiana Insurance] Policy for loss or destruction of the improvements on [the Building]." Appellant's App. p. 67 (emphasis added). The release further stated, however, that "[Seeber] acknowledge[s] that the Kidwells are making no representation that any additional proceeds are available under the policy." Appellant's App. p. 67.

After the fire, the Insurance Companies agreed that the actual cash value of the Building was $512,418.12 and the replacement cost of the Building was $650,812.70. Based upon an unwritten, agreed upon split for the actual cash value payment, General Fire & Casualty paid $220,339.84 and Indiana Insurance paid $292,078.39 to the insureds. These payments totaled the full agreed actual cash value of the Building.

## B. Facts Relating to the Proposed Replacement Properties

In December of 2008, approximately one month after the fire, Seeber purchased a 25% interest in a property located on North Walnut Street[2] in Bloomington. This property is a three-story mixed-use building, with one-third of the building devoted to retail space and the other two-thirds devoted to residential rental space. Seeber's interest in the building was valued at $422,118.00.

---

[2] Both the parties and the trial court sometimes refer to this property as being located on North Washington Street.

4

On August 12 and 27, 2010, Seeber notified Indiana Insurance of his purchase of an interest in the North Walnut Street property and indicated that he intended to use the purchase as a replacement property. On October 5, 2010, Seeber notified General Fire & Casualty of the purchase of the proposed replacement property. At this time, Seeber's counsel was informed that General Fire & Casualty would review the replacement property proposal. Seeber filed the underlying action before General Fire & Casualty finished their review of the proposal.

During the pendency of the underlying action, on January 15, 2014, Seeber purchased four condominiums located on West Allen Street in Bloomington. Each of the condominiums is a single-story residential building. The value of the condominiums was $355,000.00.

### C. Procedural History

Seeber filed a complaint for declaratory judgment on November 1, 2010, requesting that the trial court interpret his rights under the relevant insurance policies. In making this request, Seeber claimed that he was entitled to receive the full $650,812.70 replacement cost of the Building. Thus, Seeber argued that he was entitled to recover an additional $138,394.58 from the Insurance Companies.

On December 30, 2013, Seeber filed a motion for summary judgment, along with designated evidence and a memorandum in support of his motion. Also on December 30, 2013, General Fire & Casualty and Indiana Insurance each filed motions for summary judgment, designated evidence, and supporting memoranda. The Insurance Companies filed

briefs in opposition to Seeber's motion for summary judgment, and Seeber filed a brief in opposition to each of the Insurance Companies' motions for summary judgment. Each party also filed a reply memorandum in support of its motion for summary judgment.

The trial court conducted a hearing on the competing summary judgment motions on March 21, 2014. Following the hearing, the trial court took the matter under advisement and ordered each party to submit a proposed summary judgment order within two weeks. On April 17, 2014, the trial court entered an order denying Seeber's motion for summary judgment and granting summary judgment in favor of the Insurance Companies. This appeal follows.

## DISCUSSION AND DECISION

Seeber contends that the trial court abused its discretion in denying his motion for summary judgment and in granting summary judgment in favor of the Insurance Companies. The Insurance Companies, for their part, contend that the trial court properly denied Seeber's motion for summary judgment and granted summary judgment in their favor.

### A. Standard of Review

Insurance contracts are governed by the same rules of construction as other contracts. *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 667 (Ind. 1997); *see also Bowers v. Kushnick*, 774 N.E.2d 884, 887 (Ind. 2002). Proper interpretation of an insurance policy, even if it is ambiguous, generally presents a question of law that is appropriate for summary judgment. *Guzorek*, 690 N.E.2d at 667. Clear and unambiguous policy language must be given its ordinary meaning. *Id*. However, where there is an ambiguity, insurance policies are to be construed strictly against the insurer. *Am. States Ins. Co. v. Kiger*, 662 N.E.2d 945, 947 (Ind. 1996), *reh'g denied*. "This strict construal against the insurer is driven by the fact that the insurer drafts the policy and foists its terms upon the customer." *Id*. "The insurance companies write the policies; we buy their forms or we do not buy insurance." *Id*.

6

Failure to define a term in an insurance policy does not necessarily make it ambiguous. *Guzorek*, 690 N.E.2d at 667. Rather, an insurance policy is ambiguous only if a provision is susceptible to more than one reasonable interpretation. *Id*. Additionally, an "ambiguity is not affirmatively established simply because controversy exists and one party asserts an interpretation contrary to that asserted by the opposing party." *Beam v. Wausau Ins. Co.*, 765 N.E.2d 524, 528 (Ind. 2002), *reh'g denied*.

*Am. Home Assur. Co. v. Allen*, 814 N.E.2d 662, 666-67 (Ind. Ct. App. 2004), *trans. dismissed*.

Pursuant to Rule 56(C) of the Indiana Rules of Trial Procedure, summary judgment is appropriate when there are no genuine issues of material fact and when the moving party is entitled to judgment as a matter of law. *Heritage Dev. of Ind., Inc. v. Opportunity Options, Inc.*, 773 N.E.2d 881, 887 (Ind. Ct. App. 2002).

When reviewing the grant or denial of a motion for summary judgment "we stand in the shoes of the trial court." *City of Gary v. Ind. Bell Tel. Co.*, 732 N.E.2d 149, 153 (Ind. 2000).… "In reviewing cross-motions for summary judgment, we consider each motion separately." *Girl Scouts of S. Ill. v. Vincennes Ind. Girls, Inc.*, 988 N.E.2d 250, 253 (Ind. 2013). Where, as here, the dispute is one of law rather than fact, our standard of review is de novo. *See Spangler v. Bechtel*, 958 N.E.2d 458, 461 (Ind. 2011). Further, the trial court in this case entered findings of fact and conclusions of law, "neither of which are required nor prohibited in the summary judgment context." *City of Gary*, 732 N.E.2d at 153. "Although specific findings aid our review of a summary judgment ruling, they are not binding on this Court." *Id*. Finally, "we are not limited to reviewing the trial court's reasons for granting or denying summary judgment but rather we may affirm a grant of summary judgment upon any theory supported by the evidence." *Wagner v. Yates*, 912 N.E.2d 805, 811 (Ind. 2009).

*Alva Elec., Inc. v. Evansville-Vanderburgh Sch. Corp.*, 7 N.E.3d 263, 267 (Ind. 2014).

A party seeking summary judgment bears the burden to make a prima facie showing that there are no genuine issues of material fact and that the party is entitled to judgment as a matter of law. *American Management, Inc. v. MIF Realty, L.P.*, 666 N.E.2d 424, 428 (Ind. Ct. App. 1996). Once the moving

7

party satisfies this burden through evidence designated to the trial court pursuant to Trial Rule 56, the non-moving party may not rest on its pleadings, but must designate specific facts demonstrating the existence of a genuine issue for trial. *Id.* A trial court's grant of summary judgment is "clothed with a presumption of validity," and the appellant bears the burden of demonstrating that the trial court erred. *Best Homes, Inc.*, 714 N.E.2d at 706 (quoting *Barnes v. Antich*, 700 N.E.2d 262, 264-65 (Ind. Ct. App. 1998)).

*Heritage Dev.*, 773 N.E.2d at 888.

## B. Relevant Provisions of the Insurance Policies

### *1. General Fire & Casualty Policy*

The relevant portions of the General Fire & Casualty insurance policy read as follows:

A. COVERAGES
We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

\*\*\*\*

E. PROPERTY LOSS CONDITIONS

\*\*\*\*

6. Loss Payment
In the event of loss or damage covered by this policy:

a. We will not pay you more than your financial interest in the Covered Property.

b. We will either:
   (1) Pay the value of lost or damaged property, as described in paragraph d. below;
   (2) Pay the cost of repairing or replacing the lost or damaged property, plus any reduction in value of repaired items;
   (3) Take all or any part of the property at agreed or appraised value; or
   (4) Repair, rebuild or replace the property with other property of like kind and quality.

c. We will give notice of our intentions within 30 days after we receive the sworn statement of loss.

d. We will determine the value of Covered Property as follows:
   (1) If Replacement Cost is designated in the Declarations for Buildings or Business Personal Property, loss shall be adjusted on the replacement cost value of the property, except as

8

provided in (3) through (8) below.

    (a)    You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on a actual cash value basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within 180 days after the loss or damage.

    (b)    We will not pay on a replacement cost basis for any loss or damage:

        (i)    Until the lost or damaged property is actually repaired or replaced; and

        (ii)    Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

    (c)    We will not pay more for loss or damage on a replacement cost basis than the least of:

        (i)    The cost to replace, on the same premises, the lost or damaged property with other property:

            i.    Of comparable material and quality; and

            ii.    Used for the same purpose; or

        (ii)    The amount you actually spend that is necessary to repair or replace the lost or damaged property.

Appellant's App. pp. 151, 169.

### 2. *Indiana Insurance Policy*

A. Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

****

E. Loss Conditions

****

4. Loss Payment

a.    In the event of loss or damage covered by this Coverage Form, at our option, we will either:

    (1)    Pay the value of lost or damaged property;

    (2)    Pay the cost of repairing or replacing the lost or damaged property subject to b. below;

    (3)    Take all or any part of the property at an agreed or appraised

9

value; or

 (4) Repair, rebuild or replace the property with other property of like kind and quality, subject to b. below.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation condition.

b. The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

c. We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

d. We will not pay you more than your financial interest in the Covered Property.

e. We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

****

G. Optional Coverages

****

3. Replacement Cost

****

d. We will not pay on a replacement cost basis for any loss or damage:

 (1) Until the lost or damaged property is actually repaired or replaced; and

 (2) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

****

e. We will not pay more for loss or damage on a replacement cost basis than the least of (1), (2) or (3), subject to f. below:

 (1) The Limit of Insurance applicable to the lost or damaged property;

 (2) The cost to replace the lost or damaged property with other property:

  (a) Of comparable material and quality; and

  (b) Used for the same purpose; or

 (3) The amount actually spent that is necessary to repair or replace the lost or damaged property.

****

f. The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the

10

construction, use or repair of any property.

Appellant's App. pp. 263, 271-72, 275-76.

## C. Analysis

Again, Seeber contends that the trial court erred in denying his motion for summary judgment and in granting summary judgment in favor of the Insurance Companies. For their part, the Insurance Companies contend that the trial court properly granted their motions for summary judgment and denied Seeber's motion for summary judgment.

### 1. Overview of Actual Cash Value vs. Replacement Cost

The actual cash value policy is a pure indemnity contract. Its purpose is to make the insured whole but never to benefit him because a fire occurred. *Appleman on Insurance 2d* § 3823 at pp. 218-219; *Brand Distributors Inc. v. Insurance Co. of North America*, (1976) 532 F.2d 352 (4th Cir.). Replacement cost coverage, on the other hand, reimburses the insured for the full cost of repairs, if he repairs or rebuilds the building, even if that results in putting the insured in a better position than he was before the loss.

If a fire occurs in a new building, the actual cash value generally is equivalent to the cost of repairs since the full cost of repair merely restores what was there. It indemnifies but does no more. If an old building burns to the ground, the actual value is commonly established by reference to its fair market value less the value of the land on which the building sits. If an old building has only very minor fire damage, repairs probably do not result in a substantial betterment, and depreciation is usually ignored in adjusting the loss. However when the building is old or obsolescent and is seriously damaged but not destroyed, the actual cash value is more likely to be disputed. The courts uniformly hold, as did the Court of Appeals, that actual cash value insurance is strictly a contract of indemnity. The insured should be made whole but not be put in a better position than he was in before the fire. *Braddock v. Memphis Fire Ins. Corp.*, (1973) Tenn., 493 S.W.2d 453.

"A problem common to all the foregoing tests is the extent to which physical deterioration and obsolescence should be taken into account in computing loss. If the principal of indemnity be adhered to, depreciation must be considered in loss adjustment so that the insured will not receive the equivalent of a new building for a loss of the old one. Insurance law is not

11

concerned with the estimated depreciation charged off on the books of business establishment but rather with the actual deterioration of a structure by reason of age and physical wear and tear, computed at the time of the loss." 49 Colum. L.R., 818, 823. The same principle is discussed at 44 Am. Jur. 2d 549, *Appleman on Insurance 2d*, § 2823 at p. 226.

A building constructed thirty years ago will have many interior features and structural components that are not only old and used, but of a style, material and color no longer available or in fashion. If damaged by a fire, they will be replaceable only with new components and the fire will be the occasion of renovation and remodeling which, if done without reference to a fire, would be an improvement paid for by the owner. 44 Am. Jur. 2d p. 549. In such event, the property is worth more and the fire loss provided the insured with an enhancement for the value of his assets.

Replacement cost insurance on the other hand is not a pure indemnity agreement. It is an optional coverage that may be purchased and added to a basic fire policy by endorsement. It is more expensive because the rate of premiums is higher and the amount of insurance to which that rate applies is usually higher.

Replacement cost coverage is available on the insurance market to meet the need which troubled the plaintiff. That need may be expressed this way:

Since fire is an unwanted and unplanned for occurrence, why can't the owner of an older home buy insurance to cover the full cost of repair even if those repairs make it a better or more valuable building? Since at the time of fire the homeowner may be least able to pay for improvements, why can't that hazard be insured too? Instead of apportioning the cost of repair after a fire between the actual cash value, to be paid by the insurer, and the betterment to be paid by the insured, why can't the policyholder simply pay a higher premium each year but not have to pay anything more to have his home fully repaired in the event of fire?

When the insurance industry adopted a standard extension of coverage endorsement to provide replacement cost, it took into account the one great hazard in providing this kind of coverage: the possibility for the insured to reap a substantial profit, if fire occurs. *See Higgins v. Insurance Co. of North America*, (1970) 256 Or. 151, 469 P.2d 766, 66 A.L.R.3d 871 and the annotation beginning at 66 A.L.R.3d 886.

*Travelers Indem. Co. v. Armstrong*, 442 N.E.2d 349, 352-53 (Ind. 1982).

2. *First Proposed Replacement Building (Building on North Walnut Street)*

Seeber argues that the first proposed replacement building, *i.e.*, the building located on North Walnut Street, qualified as a replacement property under both of the applicable insurance policies, and, as a result, he was entitled to receive replacement costs for this property. Without conceding that this property would qualify as a replacement property, the Insurance Companies argue that Seeber is not entitled to any additional funds relating to the purchase of this property because the $512,418.12 actual cash value that has already been paid to Seeber was greater than the $422,118.00 Seeber spent to purchase his interest in the property.

With respect to replacement cost coverage provided by the applicable insurance policies, both the General Fire & Casualty and Indiana Insurance Policy stated as follows:

> We will not pay more for loss or damage on a replacement cost basis than the least of …
> [(1)] The cost to replace, on the same premises, the lost or damaged property with other property:
> > [(a)] Of comparable material and quality; and
> > [(b)] Used for the same purpose; or
> [(2)] The amount you actually spend that is necessary to repair or replace the lost or damaged property.

Appellant's App. pp. 169, 276. This language is not ambiguous as it clearly states that, with respect to a claim for replacement cost coverage, the Insurance Companies will pay the least of the cost to replace the property with other property of comparable material and quality that is used for the same purpose or the amount one actually spends to replace the lost or damaged property. As such, because the Insurance Companies paid Seeber an amount that was approximately $90,000.00 greater than the amount that they would be obligated to pay under a claim for replacement cost coverage, *i.e.*, the $422,118.00 that Seeber actually spent to

replace the Building, the Insurance Companies do not owe Seeber any additional funds relating to the purchase of an interest in the building located on North Walnut Street.

### 3. Second Proposed Replacement Building (Condominiums on West Allen Street)

Seeber contends that in granting summary judgment in favor of the Insurance Companies, the trial court erroneously determined that the second proposed replacement building, *i.e.*, the condominiums on West Allen Street, did not qualify as replacement property under the terms of the applicable insurance policies. For their part, the Insurance Companies contend that the trial court properly determined that the condominiums did not qualify as replacement property because the condominiums were not used for the same purpose as the Building or purchased in a timely fashion.

#### a. Whether the Condominiums Would Be Used for Same Purpose as the Building Destroyed By Fire

Seeber argues that the Building and the condominiums were used for the same purpose, *i.e.*, investment properties that were leased to tenants. The Insurance Companies, for their part, argue that the condominiums, which were indisputably used for residential purposes, were not used for the same purpose as the Building, which was used for commercial purposes. In support of their claim that the properties were not used for the same purpose, the Insurance Companies cite to *Fitzhugh 25 Partners, L.P. v. KILN Syndicate KLN 501*, 261 S.W.3d 861 (Tex. App. 2008), an opinion of the Court of Appeals of Texas.

In *Fitzhugh*, the court considered whether a proposed replacement property would be used for the same purpose as a property that had been destroyed by fire. In interpreting similar language to that included in the insurance policies that apply in the instant matter, the

14

*Fitzhugh* court found as follows:

> The word "replacement" is not defined in the policy. We must, therefore, give the term its ordinary and generally accepted meaning. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 158-159 (Tex. 2003). Webster's Third New International Dictionary defines "replacement" as a "substitution" or "a new fixed asset or portion of an asset that takes the place of a discarded one." *See* Webster's Third New International Dictionary 1925 (1993). For something to be a "substitution" or "take the place of" the original, it must serve the same function as the original. The vast majority of cases that have examined this issue have concluded that the term "replacement" inherently contains the element of functional similarity. *See, e.g., SR Int'l Bus. Ins. Co. Ltd. v. World Trade Ctr. Props., LLC*, 445 F. Supp. 2d 320, 334 (S.D.N.Y. 2006) (for rebuilt property to be replacement there must be "functional similarity"); [*Harrington v. Amica Mut. Ins. Co.*, 645 N.Y.S.2d 221, 226 (N.Y. App. Div. 1996)] (new structure did not "replace" insured's home where insured did not live there); *Conway v. Farmers Home Mut. Ins. Co.*, 26 Cal. App. 4th 1185, 31 Cal. Rptr. 2d 883 (1994) (term "replace" includes substituting an item that serves same function); [*Huggins v. Hanover Ins. Co.*, 423 So.2d 147, 150 (Ala. 1982)] (house was a "replacement" where it served same function as original). *but see Ruter v. N.W. Fire & Marine Ins. Co.*, 72 N.J. Super. 467, 178 A.2d 640, 643 (1962) (replacement need not be identical to original or intended for same occupancy and use).

261 S.W.3d at 864 (footnote omitted). The court agreed with Fitzhugh's contention that "the policy's limitation on recovery of replacement costs to 'the cost of repair or replacement with similar materials on the same site and used for the same purpose' is merely a method of calculating damages and not a requirement that Fitzhugh replace the apartment complex with substantially identical buildings at the same physical location." *Id*. at 864-65. The court disagreed, however, with Fitzhugh's contention that it could spend the money it recovered under a claim for replacement costs on anything it chose because "[s]uch an interpretation reads the condition that the property be 'replaced' out of the policy." *Id*. at 865.

The court determined that:

Under the policy, Fitzhugh was permitted to replace the apartments with different buildings at a different site as long as the new buildings were devoted to the same use. For example, it could have purchased or built a larger apartment complex at a different location. *See Davis v. Allstate Ins. Co.*, 781 So.2d 1143, 1144-45 (Fla. Dist. Ct. App. 2001). The amount of Fitzhugh's recovery under the policy was limited to the cost of rebuilding similar or comparable buildings on the same site or the amount it actually spent to replace the property, whichever was less. *See id.; see also Republic Underwriters Ins. Co. v. Mex-Tex, Inc.*, 150 S.W.3d 423, 425 (Tex. 2004). For the replacement cost coverage to apply, however, Fitzhugh must have purchased or built a property that was functionally similar to the property that was destroyed. *See S & S Tobacco & Candy Co., Inc. v. Greater New York Mut. Ins. Co.*, 224 Conn. 313, 617 A.2d 1388, 1390-91 (1992). If the new property is not functionally similar to the destroyed property, it is an unrelated expenditure and the destroyed property has not been "replaced."

*Id*. at 865. The court concluded that a commercial office park was not "functionally similar" to the destroyed apartment complex despite Fitzhugh's argument that both were properties with rent-paying tenants. *Id*. In reaching this conclusion, the court stated acceptance of Fitzhugh's argument in this regard "would expand the definition of the term 'replacement' far beyond its reasonable meaning" and noted that "[u]nder Fitzhugh's analysis, any form of property with tenants could serve as a replacement for the apartment complex." *Id*. The court further stated that

This type of analysis would allow an insured to replace a house with an apartment complex because they are both "residential" or to replace an office building with a hospital because they both involve the rendition of professional services to the public. Overall, an office park, which has as its primary function the conduct of business, is not functionally similar to an apartment complex, which functions primarily as a residence for individuals and families.

*Id*. In light of its conclusion that the commercial office park was not functionally similar to the destroyed apartment complex, the court concluded that the trial court correctly granted summary judgment in favor of the insurance company because Fitzhugh did not replace the

16

destroyed property covered under the policy and, therefore, did not meet the condition precedent to its recovery of replacement costs. *Id*. We find the analysis and conclusions of the *Fitzhugh* court to be compelling.

Again, with regard to replacement cost coverage, the insurance policies at issue in the instant matter state that a replacement property must be "[u]sed for the same purpose" as the original property. Appellant's App. pp. 169, 276. Here, the Building was a single-story building that was leased to a tenant who used the building for commercial retail purposes. The second proposed replacement property was four condominiums that would be used for residential purposes. Review of the applicable insurance policies reveals that both the General Fire & Casualty Policy and the Indiana Insurance Policy explicitly state that the policies apply to commercial property. The language contained in the applicable insurance policies suggests that the policies consider commercial use to be different than residential use.

Further, we agree with the court's determination in *Fitzhugh* that it would expand the definition of the term "replacement" far beyond its reasonable meaning if we were to accept Seeber's claim that the properties at issue were used for the same purpose merely because they were investment properties which had tenants. We therefore conclude that the trial court properly determined that the condominiums were not used for the same purpose as the Building.[3]

## CONCLUSION

---

[3] Having made this conclusion, we need not consider whether the second proposed replacement property was purchased within a reasonable time after the destruction of the Building.

17

In sum, we conclude that (1) Seeber is not entitled to any additional funds with respect to the first proposed replacement property and (2) the second proposed replacement property does not qualify as a replacement property because it will not be used for the same purpose as the Building. As such, we further conclude that the trial court properly denied Seeber's motion for summary judgment and granted summary judgment in favor of the Insurance Companies.

The judgment of the trial court is affirmed.

BARNES, J., and BROWN, J., concur.