

In The
Court of Appeals
Seventh District of Texas at Amarillo

No. 07-14-00109-CV

DOE #1, DOE #2 AND DOE #3, APPELLANT

V.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., APPELLEE

On Appeal from the 108th District Court
Potter County, Texas
Trial Court No. 98,575-E, Honorable Douglas Woodburn, Presiding

July 6, 2015

Dissenting Opinion

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

I wonder if insurance companies cause their own problems by writing policies laden with amendments, endorsements, and odd selection of words. The latter often hinder my ability to comprehend the numerous contracts and documents I am asked to read and construe on a regular basis. That seems to be the situation here.[1] Believing the majority opinion to be the better result but not the right one, I respectfully dissent.

---

[1] Appended to the initial policy at bar are amendments and at least fourteen endorsements. Some are short. Some are long. Some are cryptic. And, together, they make the policy quite lengthy and difficult to read.

Resolution of the appeal depends upon the construction of the policy. What it means is a question of law. *In re Deepwater Horizon*, No. 13-0670, 2015 Tex. LEXIS 141, at *28 (Tex. February 13, 2015). And, in construing it, we follow the same rules applicable to interpreting any other contract. *JAW The Pointe, L.L.C. v. Lexington Ins. Co.*, No. 13-0711, 2015 Tex. LEXIS 343, at *11 (Tex. April 24, 2015); *Gilbert Texas Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). Those rules obligate us to ascertain the parties' intent, and doing so requires us to first presume that the parties intended what the words of their contract say. *Gilbert Texas Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d at 126. So too must we examine the entire agreement and seek to harmonize and effectuate all provisions so that none will be rendered meaningless. *Id.* As for the words used by the parties, we assign them their ordinary and generally accepted meaning unless the policy evinces that they were meant in a technical or different sense. *Id.* Finally, that endorsements to a policy are part of the policy is beyond doubt.

The policy in question is titled "COMMERCIAL GENERAL LIABILITY DECLARATIONS." Under the part labeled "COMMERCIAL GENERAL LIABILITY COVERAGE FORM" there appears "Section 1 - Coverages." Within that section are sub-categories denominated "COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY," "COVERAGE B. PERSONAL AND ADVERTISING LIABILILTY," and "COVERAGE C. MEDICAL PAYMENTS." Each sub-category contains sub-paragraphs denominated "Exclusions." Four other "sections" appear in the general policy as well. Section "II" specifies "WHO IS AN INSURED," while sections "III," "IV,"

and "V" encompass "LIMITS OF INSURANCE," "COMMERCIAL GENERAL LIABILITY CONDITIONS," and "DEFINITIONS," respectively.

Under Section I, Coverage A, National Union Fire Insurance Company (National) agreed to "pay those sums that the insured becomes legally obligated to pay because of 'bodily injury' or 'property damage' to which this insurance applies." Regarding the exclusions found under Section I, Coverage A, there appear paragraphs "a" through "n." Each of those, except for paragraph "d" and "n" begins by referencing either or both "[b]odily injury or "property damage." Paragaph "d" refers to obligations of the insured "under a workers' compensation, disability benefits or unemployment compensation law or any similar law." Paragraph "n" alludes to damages from "[y]our product." "[y]our work," or "[i]mpaired property." That the claims of Doe #1, Doe #2 and Doe #3 (Doe) were submitted under Section I, Coverage A (as it pertains to "bodily injury") is undisputed.

Next, endorsement MS #2 is entitled "CLERGY COUNSELING PROFESSIONAL LIABILITY COVERAGE." Following the title is the statement that "[t]his Endorsement modifies such insurance as is afforded by the provisions of the policy relating to COMPREHENSIVE GENERAL LIABILITY INSURANCE." That language is followed by a provision saying "[i]t is agreed that:

1. The definition of bodily injury is amended to include any acts, errors, or omissions of the insured arising out of counseling activities of the insured.

2. The PERSONS INSURED provision is amended to include any cleric, elder or ministerial servant designated as such by the named insured while giving counsel within the scope of his duties as such.

3. The Exclusions are *replaced* by the following:

3

This insurance does not apply to:

a) liability assumed by the insured under any contract or agreement.

b) liability on account of bodily injury to or sickness, disease or death of any employee of the insured arising out of and in the course of his employment or to any obligation for which the insured or any carrier as his insurer may be held liable under any Worker's Compensation, Unemployment Compensation or Disability Benefits Law or under any similar law.

c) liability resulting from the rendering of medical, radiological, surgical, dental or nursing treatments, including shock therapy and the prescription, utilization, furnishing or dispensing of drugs or medical, radiological, surgical, dental or nursing supplies or appliances.

d) liability resulting from the insured's commitment to a psychiatric institution.

e) the ownership, maintenance, operation, use, loading or unloading of any motor vehicle, trailer, semi-trailer, watercraft of [sic] aircraft.

f) liability resulting from the acts, errors or omissions of the insured as a member of a formal accreditation or professional board or committee of any hospital or professional society.

g) liability resulting from an insured accepting and/or undertaking custodial care or responsibility of a patient pursuant to request, instruction, authorization or direction of any governmental agency, authority, board or officer having such authority or responsibility.

h) liability resulting from any actual or alleged conduct of sexual nature.

i) injury arising out of willful violation of a penal statute or ordinance committed by or with the knowledge or consent of any insured.

j) any dishonest, fraudulent or criminal act or omissions of any insured.

All other terms, conditions, and premiums remain the same.

(Emphasis added). In turn, endorsement MS #14, issued in 1992, states: "In consideration of the premium charged, it is hereby understood and agreed that MS #2 'Clergy Counseling Professional Liability Coverage' is amended as follows: 3. 'The

4

Exclusions for this coverage part only are replaced by the following:'" Nothing comes thereafter except a final sentence providing: "All other terms and conditions remain unchanged" and a blank signature line.

Reading MS #2 in its entirety, I observe that it did not expressly create a general or free-standing category of insurance pertaining to clergy counseling, despite the name appended to it.[2] Instead, it simply changed pre-existing portions of the insurance agreement. For instance, it expanded the prior definition of "bodily injury" found in Section V (*i.e.* "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time") to also encompass injury from "acts, errors, or omissions . . . arising" from "counseling activities."[3] So too was the prior category of insureds specified in Section III of the agreement expanded to include clerics, elders and "ministerial servants."

As for the "Exclusions," I note that they reference liability related to the performance of particular types of activity in general. No verbiage expressly ties those activities to a specific category of insured, such as clerics, elders, or ministerial servants. Nor does any verbiage expressly link the conduct to "counseling activities" performed by any specified insured. Instead, the provision states, without words of limitation, that the insurance "does not apply to" X, Y and Z, for example, and within X,

---

[2] This is unlike another endorsement entitled "Garagekeepers Coverage" specifying the terms and limitations of coverage for those activities.

[3] A literal reading of the passage makes "acts, errors, or omissions" related to "counseling activities" instances of bodily injury. And, this literal interpretation could lead one to wonder how "acts" or "errors" or "omissions" in themselves constitute injury. But the language of a contract may not be interpreted in a way that leads to an absurd result, *Hemyari v. Stephens*, 355 S.W.3d 623, 626 (Tex. 2011), and given the context of the endorsement, the parties undoubtedly intended that injury caused by acts, errors, or omissions arising from counseling activities was also to be considered "bodily injury" for which coverage was afforded.

Y, and Z lie the category of activities involving "conduct of [a] sexual nature" and the violation of penal laws invoked by National .

Nonetheless, Doe would have us consider the title of the endorsement as providing the words of limitation I find missing. Though the title refers to "clergy counseling," a heading is not controlling. *Royal Food & Gas, Inc. v. Petrofuels Corp.*, No. 09-07-001-CV, 2007 Tex. App. LEXIS 8121, at *16 (Tex. App.—Beaumont June 28, 2007, no pet.) (mem. op.). Indeed, no single provision of a contract will be afforded controlling affect when read alone. *SAS Instr., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005). Additionally, a number of the exclusions in MS #2 encompass the same topics found under Section I, Coverage A, paragraph 2 "Exclusions" of the policy. They include an insured's assuming liability via a contract or agreement, obligations arising under worker's compensation, disability, and unemployment benefit laws, and liability arising from the operation of motor vehicles and boats. Reading MS #2 as merely imposing such exclusions on clergy when they appear elsewhere in the policy and already cover all insureds (whether clergy or not) seems nonsensical to me.

Nor can I ignore the language indicating that the "Exclusions" are "replaced" by those itemized in MS #2. Under common parlance, that word means to take the place or substitute. *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1056 (11TH ed. 2003); *Fitzhugh 25 Partners, L.P. v. KILN Syndicate KLN 501*, 261 S.W.3d 861, 863 (Tex. App.—Dallas 2008, pet. denied). Given that Sections I through V of the policy did not 1) specifically name clerics or ministers or elders as insureds, 2) allude to injury arising from "counseling activities" as "bodily injury," or 3) contain "exclusions" expressly pertinent to clerics, ministers, elders, or counseling activities, there was and is nothing

6

for the exclusions in MS #2 to *take the place of* if they simply relate to clergy and counseling activities, as posited by Doe.

Also unavailing to me is the argument that MS #2 is ambiguous. To be ambiguous, the language in question must be susceptible to two or more reasonable interpretations. *RSUI Indem. Co. v. Lynd Co.*, No. 13-0080, 2015 Tex. LEXIS 442, at *9 (Tex. May 8, 2015). Ambiguity does not arise "merely because both parties can point to words or phrases that, read in isolation, favor different constructions of the contract, or because both parties can identify language that, through the lens of hindsight, could have been more clearly stated." *Id.* at *41. Reading the policy as a whole, reading it in conjunction with the language contained in the multiple sections of the "Commercial General Liability Declarations." and noting the lack of language expressly restricting its scope, I cannot say that the verbiage of endorsement MS #2 supports a reasonable construction indicating that it applies only to counseling activities of Doe clergy.[4] Admittedly, the insurance policy could have been written in a much clearer manner. Admittedly, the numerous endorsements and additions to the policy at bar make it

---

[4] Endorsement MS #14 does not change our conclusion. It amends MS #2, which modified the insurance ". . . afforded by the provisions of the policy relating to COMPREHENSIVE GENERAL LIABILITY INSURANCE." It specified that exclusions replaced by those itemized in MS #2 were the "exclusions for this coverage part only." Doe wonders about what was meant by the passage "exclusions of this coverage part" and posits that they must be exclusions made applicable only to clergy counseling activities. But, as explained in the body of this opinion, MS #2 changed aspects of Sections I through V of the policy; it did not create some free-standing form of coverage applicable to counseling activities by clergy. Nor did any express language in MS #2 restrict its scope merely to clergy counseling activities. Instead, it altered the general policy which also had other endorsements creating separate coverages, such as coverage for "Garagekeepers." More importantly, "Garagekeepers Coverage" has its own sections identifying insureds, exclusions, and the like. Therefore, MS #14 can be reasonably construed to clarify that the exclusions of MS #2 apply only to coverage created under sections I though V of the General Commercial Liability Coverage portion of the policy as opposed to distinct coverages created via endorsements or additions. MS #14 cannot be reasonably construed as restricting the scope of MS #2 to merely clergy counseling activities unless additional terms are interjected into one or the other endorsements, and we are not at liberty to interject terms omitted by the parties.

rather difficult to read. But, those circumstances do not allow me to rewrite what the parties intended via the literal definition of the words used.

So, in my view, the exclusions in MS #2 apply to the policy in general, not just to the acts of clergy or counseling activities, as suggested by Doe. This leads me to conclude that the trial court did not err in granting National's motion for summary judgment. But, again, the entire dispute could have been avoided if the insurance company simply said what it purportedly intended. English is not a language of limited content. It encompasses more words than most people (including this writer) will ever read. Within that relatively limitless range, anyone charged with drafting a contract, policy, document or other writing can find terms that clearly express his intended thought. Writing is not magic; it is simply saying what you mean in a way for the eyes to read and the brain to comprehend. This, of course, presumes that the writer wants to be understood.

I respectfully dissent.


Brian Quinn
Chief Justice